## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JARROD WATSON, and LINDA WATSON,
as co-Next Friends for A.W., a minor; and
JARROD WATSON and LINDA WATSON,                   Case No.
individually,                                      Hon.

                    Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT;
TIMOTHY THRONE, in his individual capacity;
STEVEN WOLF, in his individual capacity;
NICHOLAS EJAK, in his individual capacity;
PAM PARKER FINE, in her individual capacity;
SHAWN HOPKINS, in his individual capacity;
KIMBERLY POTTS, in her individual capacity; and
KENNETH WEAVER, in his official capacity,

                    Defendants.

_____/

TODD F. FLOOD (P58555)
VINCENT J. HAISHA (P76506)
Flood Law, PLLC
Attorneys for Plaintiffs
155 W. Congress St., Ste. 603
Detroit, MI 48227
PH: (248) 547-1032
FX: (248) 547-0140
tflood@floodlaw.com
vhaisha@floodlaw.com

_____/

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

**There are eight possible companion cases between these parties
that arise out of the same transaction or occurrence as alleged
in this Complaint pending in this Court:**

2:21-cv-12871-MAG-APP (filed on 12/29/2021)
2:22-cv-10407-MAG-APP (filed on 02/24/2022)
2:22-cv-10805-MAG-APP (filed on 04/14/2022)
2:22-cv-11113-MAG-APP (filed on 05/22/2022)
2:22-cv-11251-MAG-APP (filed on 06/07/2022)
2:22-cv-11360-MAG-APP (filed on 06/17/2022)
2:22-cv-11398-GAD-CI (filed on 06/23/2022)
2:22-cv-11448-MAG-APP (filed on 06/28/2022)

NOW COME, the Plaintiffs, JARROD WATSON and LINDA WATSON, co-Next Friends for A.W., a minor, by and through their attorneys, FLOOD LAW, PLLC, and for their Complaint and cause of action against the Defendants, state the following:

## <u>INTRODUCTION</u>

On the morning of November 30, 2021, tenth grader, John Doe ("Doe"), came to school armed and ready to commit the unimaginable, horrific slaughter of his fellow classmates Oxford High School.

*Who knew what, when did they know and what did they do with the information?*

Prior to this horrific day, school officials were put on notice on at least five occasions that Doe was a threat to the safety of others. Undeniably, the paper trail shows that the Defendant Wolf was given more than a red flag indicating that Doe was exhibiting ideations of death and that his actions were screaming all the signs

of a very disturbed person. Yet, the obvious was ignored and Defendant Wolf instead failed to act reasonable care. Indeed, Defendant's Wolf's overt acts were akin to suppressing the sirens that could have prevented this tragic outcome.

### *The notice to the school and the warning ignored on the November 30, 2021*

Doe, armed with a handgun and bullets, which he carried in his backpack, went to his first-hour English class. While in class, Doe's English teacher reported to school officials that he was watching a video depicting a violent shooting. Later, during his second-hour math class, Doe's math teacher reported to school officials that Doe had drawn disturbing and violent words and images onto a class assignment, which included: **"The thoughts won't stop. Help me....blood everywhere…My life is useless…The world is dead."** Indeed, the school knew that another teacher had observed Doe searching the internet for information about bullets just 24 hours prior.

Doe's counselor, Defendant Shawn Hopkins, removed Doe from his math class, and confiscated the assignment with the violent words and images, and took Doe to the counseling office to meet with him and Defendant Nicholas Ejak, Dean of Students. Ejak, took possession of Doe's backpack and it was clear that the Doe was disturbed. So much so, that they called in Doe's parents to have him removed from the school.

Shockingly, Doe's parents refused to remove Doe from OHS. Defendants Hopkins and Ejak then made the decision to return Doe and his unsearched backpack to his classroom. Two hours later, life for the Watson family was changed forever.

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution and the laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C §§ 1983 and 1988, and under the statutes and common law of the State of Michigan.

2.     This Court has jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4) and 42 U.S.C. § 1983.

3.     This Court should exercise supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), because those claims arise out of the same facts as the federal claims and all claims are part of the same case or controversy.

4.     Venue is proper pursuant to 28 U.S.C. § 1391(d), as all of the events giving rise to this action occurred in Oakland County, Michigan, which is located within the Eastern District of Michigan, and the parties reside in the Eastern District of Michigan.

## PARTIES

### A. The Plaintiffs

1.      At all times relevant hereto, A.W. was a minor who lived with his parents, JARROD WATSON and LINDA WATSON, who are being appointed with the filing of this Complaint as co-Next Friends for A.W.

2.      At all times relevant hereto, A.W. was a fifteen-year-old student at Oxford High School ("OHS") who sustained a close-range gunshot wound through his leg, causing serious and permanent injuries and damages, by JOHN DOE ("Doe") while at OHS on November 30, 2021.

3.      At all times relevant hereto, A.W. and his parents, JARROD WATSON and LINDA WATSON, were citizens of the State of Michigan.

4.      A.W., JARROD WATSON and LINDA WATSON are collectively referred to as "Plaintiffs" or "the Plaintiffs" unless otherwise specified.

### B. The Oxford Defendants

5.      At all times relevant hereto, Defendant OXFORD COMMUNITY SCHOOL DISTRICT ("OCSD") was a Michigan municipal corporation organized and carrying out its functions in the Township of Oxford, Michigan. OCSD conducts all operations for OHS, including but not limited to funding, staffing, training, supervising the staff, counselors and teachers at OHS and maintaining the safety and

security of school facilities for the education and welfare of students at OHS, including A.W.

6.     OCSD is being sued pursuant to 42 U.S.C. § 1983 for its official policies, practices and customs, which were the motivating force and cause-in-fact for the decision to return Doe from the safety and security of the counseling office to the classroom on November 30, 2021.

7.     At all times relevant hereto, Defendant TIMOTHY THRONE ("THRONE") was a citizen of the State of Michigan and was employed as the Superintendent of OCSD and was acting under the color of state law within the course and scope of his employment with OCSD. THRONE is being sued for gross negligence under state law.

8.     At all times relevant hereto, Defendant STEVEN WOLF ("WOLF") was a citizen of the State of Michigan and was employed as the Principal of OHS, within the Oxford Community School District, and was acting under the color of state law within the course and scope of his employment with OCSD. WOLF is being sued for gross negligence under state law.

9.     At all times relevant hereto, Defendant NICHOLAS EJAK ("EJAK") was a citizen of the State of Michigan and was employed as the Dean of Students at OHS, within the Oxford Community School District, and was acting under the color of state law within the course and scope of his employment with OCSD. EJAK is

being sued under 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

10.    At all times relevant hereto, Defendant PAMELA PARKER FINE ("FINE") was a citizen of the State of Michigan and was employed as the Restorative Practices Coordinator of OCSD and was acting under the color of state law within the course and scope of her employment with OCSD. FINE is being sued under 42 U.S.C. § 1983 in her individual capacity for actions taken under color of law and for gross negligence under state law.

11.    At all times relevant hereto, Defendant SHAWN HOPKINS ("HOPKINS") was a citizen of the State of Michigan and was employed as a counselor at OHS, within the Oxford Community School District, and was acting under the color of state law within the course and scope of his employment with OCSD. HOPKINS is being sued under 42 U.S.C. § 1983 in his individual capacity for actions taken under color of law and for gross negligence under state law.

12.    At all times relevant hereto, Defendant KIMBERLY POTTS ("POTTS") was a citizen of the State of Michigan and was employed as a security officer/armed guard at OHS, within the Oxford Community School District, and was acting under the color of state law within the course and scope of her employment with OCSD. POTTS is being sued for gross negligence under state law.

13.     OCSD, THRONE, WOLF, EJAK, FINE, HOPKINS and POTTS are collectively referred to as "the Oxford Defendants" unless otherwise specified.

**C. Defendant Kenneth Weaver**

14.     Defendant KENNETH WEAVER ("WEAVER") is a citizen of the State of Michigan and is currently employed as the Superintendent of OCSD. WEAVER is being sued in his official capacity only. WEAVER is being sued under 42 U.S.C. § 1983 for prospective equitable and injunctive relief because he is the highest ranking official of OCSD and is responsible for ensuring OCSD's compliance with state and federal laws, including the Fourteenth Amendment's Due Process Clause.

## STATEMENT OF FACTS

**A. Maintaining school safety and protecting students from deadly violence is an integral aspect of operating a school district and an integral job function of school administrators and staff.**

15.     From April 1999 to May 2022, school shootings occurred in over 331 schools in the United States, subjecting over 311,000 students to gun violence and resulting in at least 554 school-shooting injuries, including at least 185 deaths.[1]

---

[1] *More than 311,000 students have experienced gun violence at school since Columbine*, THE WASHINGTON POST (2022)
https://www.washingtonpost.com/graphics/2018/local/school-shootings-database/.

16.     Data from *The Washington Post's* investigation into school shootings that occurred between April 1999 and May 2022 showed that 85% of school shooters used a gun they either brought from home or received from relatives or a friend.[2]

17.     In 2021 alone, there were at least 202 shooting incidents on school grounds, resulting in at least 49 deaths and 126 injuries.[3]

18.     It is well established that many shooters in mass shooting events were suicidal before the attack commenced.[4]

19.     Indeed, a recent study of 134 school shootings and attempts found that:

    a.  80% of the school shooters were suicidal before the attack;

    b.  91% of the school shooters were either current or former students at the school; and

    c.  78% of the school shooters **leaked their plans** before the attack.[5]

20.     Such data undeniably demonstrates that gun violence in schools is a foreseeable risk that creates a school official's duty to confront and deescalate known threats of violence at school, including school shootings.

---

[2] *Id.*

[3] *Gunfire on School Grounds in the United States*, EVERYTOWN RESEARCH & POLICY (2021) https://everytownresearch.org/maps/gunfire-on-school-grounds/.

[4] Maggie Koerth, *Can We Prevent Mass Shootings By Preventing Suicide*? FIVETHIRTYEIGHT (Aug. 22, 2019) https://fivethirtyeight.com/features/can-we-prevent-mass-shootings-by-preventing-suicide/.

[5] *Key Findings: Analyses of School and Workplace Shootings*, THE VIOLENCE PROJECT (2019 Data) https://www.theviolenceproject.org/mass-shooter-database-3/key-findings/.

21.     According to a 2018 guide by the United States Secret Service, National Threat Assessment Center ("NATC"), the threshold for immediate intervention with regard to known threats of violence should be low.[6]

22.     Indeed, the 2018 NATC guide states: "Reports regarding student behaviors **involving weapons, threats of violence, physical violence, or concerns about an individual's safety** should immediately be reported to local law enforcement."[7]

23.     With respect to conducting threat assessments, the 2018 NATC guide directs school officials and teachers to "[e]xamine online social media pages . . . and consider searching the student's locker or desk."[8]

24.     The State of Michigan, in recognition of the risks of school mass shootings and gun violence, has enacted legislation mandating that school districts adopt school safety policies. This legislation includes the Child Protection Law, M.C.L. § 722.621 (1975); Statewide School Safety Information Policy, M.C.L. § 380.1308 (1999); Mandatory incident reporting to state police for certain crimes occurring at school, M.C.L. § 380.1308a (2019); Emergency operations plan, M.C.L. § 380.1308b (2019); Liaison for school safety commission requirements,

---

[6] National Threat Assessment Center. *Enhancing school safety using a threat assessment model: An operational guide for preventing targeted school violence*. U.S. SECRET SERVICE, DEPARTMENT OF HOMELAND SECURITY (2018).

[7] *Id.* at 6 (emphasis in the original).

[8] *Id*. at 7.

M.C.L. § 380.1241 (2019); Office of School Safety, M.C.L. § 28.681 (2019); Reporting of Crimes on the District's Website, M.C.L. § 380.1310a (2000); Student Safety Act, M.C.L. § 752.911 (2000); Save Our Students Act, M.C.L. § 380.1893 (2020); Searching Student Lockers, M.C.L. § 380.1306 (2000); Student in Possession of a Dangerous Weapon, M.C.L. § 380.1313 (1987); and M.C.L. § 380.1311a (2017).

25.     Pursuant to such legislation and in response to the increasing prevalence of school shootings nationwide, school administrators and staff, including those at OCSD, are required to enact policies and/or administer and undergo extensive training in order to recognize the symptoms, root causes and early warning signs of gun violence.

26.     The purpose of legislation mandating such extensive training and education is to prevent foreseeable acts of violence on school grounds, including school shootings.

27.     Indeed, as a matter of state law in Michigan, an essential element within the duties of school administrators, teachers and counselors is the minimization and/or elimination of the risk of gun violence in schools.

28.     Tragically, on November 30, 2021, OCSD and its employees ignored state law mandates and OSC policies and guidelines that permitted and/or required immediate removal of DOE from school grounds based on his observed behavior,

access to weapons and obvious desire to inflict harm on himself and/or others, and instead took affirmative acts to release DOE from a place of safety in the OHS counselor's office and to return him to the school population, thereby compounding the foreseeable and preventable risk of serious harm to OHS students and others.

**B. The Oxford Defendants took affirmative acts that created and increased the danger of the school shooting at OHS on November 30, 2021.**

29.     In the months leading up to the school shooting, DOE became known to OHS teachers, counselors and administrators for his concerning behavior, including but not limited to his depressed mood, disheveled appearance, minimal participation in class, refusal to complete school assignments, and inappropriate interest in weapons and violence, which indicated psychiatric distress, suicidality and the possibility of child abuse or neglect.

30.     In or around May 2021, DOE used the cell phone given to him by his parents to videotape himself torturing and killing animals, including a bird, whose head DOE cut off and placed into a jar, which he stored his bedroom for several months.[9]

31.     In or around August 2021, DOE took a video of himself holding his father's 22-caliber handgun.

---

[9] DOE's journal documented that he severed the bird's head. In addition, cell phone records discovered by police after the November 30, 2021 massacre showed video of DOE severing a bird's head.

32.     On or around that same time, DOE sent the video to a friend along with a message stating: "*It's time to shoot up the school! JK JK JK*."

33.     On or around October 2021, a month after DOE started his sophomore year at OHS, DOE became noticeably sad about his best friend leaving OHS.

34.     On or around early November 2021, HOPKINS, DOE's counselor at OHS, received an email from DOE's Spanish teacher stating that DOE seemed "sad."

35.     Pursuant to that email, HOPKINS did a check-in with DOE and told DOE that he was available if DOE needed to talk. In response, DOE looked at HOPKINS and said, "*okay*."

36.     On November 4, 2021, approximately four weeks before the OHS shooting, a severed deer's head was discovered on OHS grounds.

37.     On that same date, WOLF sent an email to OHS parents, including LINDA WATSON, to "clarify some of the rumors that [had] started," proclaiming that there was "no present threat of danger at Oxford High School."

38.     Despite such assurances for WOLF, OHS parents, including JARROD WATSON and LINDA WATSON, became concerned about the obviously disturbing discovery of the severed deer's head on OHS grounds.

39. On November 11, 2021, approximately two weeks before the OHS school shooting, DOE brought the jar with the severed bird's head to OHS and placed it in the boys' bathroom.

40. Other students found and reported their discovery of the jar with the severed bird's head to OCSD administrators, including WOLF.

41. On that same date, A.W. sent a text message to LINDA WATSON during lunch reporting that everyone at OHS was talking about threatening posts they had seen on social media stating that someone was planning to "shoot up the school" the next day (Friday, November 12, 2021). A.W. asked LINDA WATSON if he could stay home from school that day, but LINDA WATSON, relying on assurances from OCSD, told A.W. that she would report the threat to OCSD and that the school was safe.

42. Shortly after receiving the texts from her son, LINDA WATSON called OHS to report the school shooting threats. After explaining what A.W. had told her to the OHS employee who answered her call, the OHS employee sighed, told her to "hold on" and transferred her to another OHS employee who stated (1) that there were no safety issues, (2) that the "situation" had been investigated, (3) that a number of parents had already reported the same and (4) that the reports of threatening social media posts indicating an imminent school shooting were "no big deal."

43.     Upon information and belief, at the time LINDA WATSON was told by an employee or employees of OHS that her report of an imminent school shooting had been investigated, officials and employees of OCSD had not conducted a threat assessment as defined by and required under OCSD Operations Policy 8400 – SCHOOL SAFETY INFORMATION ("PO8400").[10]

44.     Moreover, at the time, OCSD had concealed the discovery of the jar with the severed bird's head from OHS parents and OHS staff despite its ability to easily review video footage from internal surveillance cameras positioned throughout OHS hallways, including cameras in front of the boys' bathroom where DOE had placed the jar with the severed bird's head.

45.     Had OCSD conducted a reasonable investigation, it would have discovered that DOE was the student responsible for placing the jar with the severed bird's head in the boys' bathroom.

46.     Nevertheless, that same day, on November 11, 2021, OHS administration sent an email to OHS parents stating: "*Please know that we have received every concern shared with us and investigated all information provided . .*

---

[10] Plaintiffs hereby incorporate by reference all OCSD policies, administrative guidelines and forms, including but not limited to those which are readily accessible on OCSD's website at the time and date of this filing.
*See* https://go.boarddOCSD.com/mi/oxf/Board.nsf/Public?open&id=policies.

. *We want our parents to know that there has been no threat to our building nor our students*."

47.     Upon information and belief, on or about November 16, 2021, several OHS parents directly informed WOLF of concerns about multiple severed animal heads at OHS and about threats of an imminent school shooting at OHS that several students had seen on social media.

48.     Instead of investigating these threats, which caused several students to be afraid for their safety at school, OCSD administrators, including WOLF, blithely ignored the threats and persisted in their campaign to conceal and minimize imminent threats to school safety.

49.     On November 16, 2021, WOLF sent an email to OHS parents stating: "*I know I'm being redundant here, but there is absolutely no threat at the HS . . . large assumptions were made from a few social media posts, then the assumptions evolved into exaggerated rumors*."

50.     That same day, THRONE took to the OHS loudspeaker and demanded that students stop spreading "rumors." THRONE further instructed students to stop relying on information found on social media and reassured that there were no threats to their safety at OHS.

51.     Upon information and belief, DOE was present in school on November 16, 2021, and heard THRONE's announcement over the loudspeaker, including

THRONE's reassurance that there were no threats to student safety and demand that students stop spreading "rumors" of an imminent school shooting.

52.     At all times relevant hereto, WOLF and THRONE's respective actions, by advising all students at OHS, including A.W., as well as OHS parents, including LINDA WATSON, that there was no threat, demonstrated a substantial lack of concern as to whether an injury would result and substantially increased the harm to all students at OHS.

53.     Moreover, WOLF's and THRONE's actions, as described above, flew in the face of PO8400, which requires parents of OHS students to "**immediately report** to the Superintendent or Principal **any expression of intent to harm** another person **or other statements or behaviors that suggest a student may intent to commit an act of violence**" as well as OCSD Administrative Guideline 5772 – WEAPONS ("AG5772"), which states: "Any student who has reason to believe that a person who has reason to believe that a person has **or will** violate this [weapons] guideline **shall report to the school principal or the supervisor of the activity immediately**." (emphasis added).

54.     AG5772 further allows the principal of OHS to conduct a search of the reported student in accordance with OCSD Administrative Guideline 5771 – SEARCH AND SEIZURE ("AG5771"), which permits a search of a student and his

belongings, including the student's backpack, as long as there is "reasonable suspicion for a search," defined under the guideline as:

> [G]rounds sufficient to cause an adult of normal intellect to believe that the search of a particular person, place or thing will lead to the discovery of evidence that the student:
>
> . . .
>
> C. **possesses an item or substance** which **presents an immediate danger of physical harm** or illness **to students and staff or District property**.

(emphasis added).

55.   Under OCSD Student Policy 5771 – SEARCH AND SEIZURE ("PO5771"), OCSD authorities have a duty to safeguard "the safety and well-being of the students in their care." Pursuant to that duty, OCSD employees are directed to request that the OHS principal conduct a search of a student and/or a student's possessions if the employee believes there is reasonable suspicion to conduct such a search. The policy further states that "[a] search prompted by the reasonable belief that health and safety are immediately threatened will be conducted with as much speed and dispatch as may be required to protect persons and property."

56.   At all times relevant hereto, DOE's social media accounts were set to allow any member of the public to view them, and the contents of his accounts were known or made known to fellow students, parents and the Oxford Defendants.

57.   On November 26, 2021, four days before the OHS shooting, DOE received a Sig Sauer 9 mm semi-automatic handgun from his father.

58.   Upon information and belief, DOE's father openly referred to the Sig Sauer 9 mm semi-automatic handgun as "DOE's gun" in front of the salesperson.

59.   Later that same day, DOE posted to his public Instagram account a photo of himself with his new gun with the caption: "*just got my new beauty [heart eyes emoji] Sig Sauer 9-millimeter. Any questions I will answer*." This post to his public Instagram account was readily accessible to any person using the internet, including the Oxford Defendants.

60.   The next day, on November 27, 2021, three days before the OHS shooting, DOE's mother took DOE to a local gun shooting range so that DOE could fire "his" new Sig Sauer 9 mm semi-automatic handgun, load it with ammunition, practice his aim and learn how to reload it.

61.   On the same date, DOE's mother posted a picture to her social media showing DOE at the shooting range with his "new Christmas present," clearly referring to the Sig Sauer 9 mm semi-automatic handgun. DOE's mother's social media account was also set to allow public viewing and was readily accessible to any person using the internet, including the Oxford Defendants.

62.     Upon information and belief, at the conclusion of the firearm practice, DOE's Sig Sauer 9 mm semi-automatic handgun was stored in his parents' bedroom drawer and was made accessible to DOE at all times.

63.     Two days later, on November 29, 2021, the day before the OHS shooting, DOE's English teacher caught DOE using his cell phone, during class, to access the internet to search for and view information about ammunition, in violation of OCSD policies.

64.     Upon information and belief, DOE's English teacher was so concerned by this behavior that she took a picture on her cell phone of the ammunition that DOE was viewing on his cell phone and promptly forwarded the picture she took to the OHS Dean of Students, EJAK, and OCSD's Restorative Practices Coordinator, FINE, informing them both that DOE had been using his cell phone, during class, to access the internet to search for and view information about ammunition.

65.     That same email was forwarded to DOE's counselor, HOPKINS.

66.     Due to her grave concerns for DOE's safety and for the safety of others at OHS, at approximately 9:00 am that morning, DOE's English teacher took DOE to the counseling office, where met with FINE and HOPKINS. The meeting only lasted five minutes.

67.     During the five-minute meeting, DOE was informed that DOE looking up bullets while in school was not "school appropriate behavior."

68.     In response, DOE informed FINE and HOPKINS that he had gone to a shooting range with his mother over the weekend to test out his new handgun (the Sig Sauer 9 mm semi-automatic handgun). He then claimed that he was simply researching information about ammunition because shooting guns was his hobby.

69.     At the time, FINE had been given a copy of the photograph taken by DOE's English teacher, which detailed ammunition for DOE's new Sig Sauer 9 mm semi-automatic handgun.

70.     Nevertheless, DOE was returned to class. FINE then called DOE's mother to discuss DOE's concerning behavior, including his search for ammunition during school hours.

71.     In accordance with OSC policy, FINE did not request a return call because the situation did not present a "disciplinary incident."

72.     DOE's mother did not return FINE's call. Instead, DOE's mother sent a text to DOE later than day asking: "*Did you show them a picture of your gun?*" "*LOL, I'm not gonna get mad at you, you have to learn to not get caught*."

73.     DOE's ammunition research, coupled with DOE's mother's failure to respond to FINE, gave FINE reasonable cause to suspect child abuse and/or neglect. Accordingly, FINE was required under the Michigan's Child Protection Law, MCL 722.623, *et seq.* to contact Child Protective Services ("CPS"). The risk posed by DOE also required that FINE to the OHS liaison officer that DOE was a victim of

child abuse or neglect and that he posed a threat to himself and others. However, FINE did not report this information to either Child Protective Services or to the OHS liaison officer.

74.     Later that same evening, on November 29, 2021, DOE posted to his public Twitter account the following message: "*Now I am become Death, the destroyer of worlds. See you tomorrow Oxford*."

75.     On November 30, 2021, the day of the OHS shooting, DOE returned to OHS, carrying his Sig Sauer 9 mm semi-automatic handgun and approximately 48 rounds of ammunition in his backpack. DOE's backpack also contained his journal, which contained twenty-one (21) pages detailing his plans to carry out the OHS shooting.

76.     In part, the journal stated: "*First off, got my gun. It's an SP2022 Sig Sauer 9-millimeter. Second, the shooting is tomorrow, I have access to the gun and ammo*." The journal also contained two distinct drawings of bullets. One of the drawings was labeled ".22" and the other was labeled "9-millimeter." The drawing labeled ".22" contained the following description: "*kill range, 25M, max*." The drawing labeled "9-millimeter" contained the following description: "*kill range, 100M*." Also pictured within the pages of DOE's journal was a picture depicting a cup containing liquid, a severed bird's head and a demon positioned next to the cup.

77.     On November 30, 2021, at approximately 8:30 am, DOE's English teacher sent an email to HOPKINS stating that DOE had been watching a violent, realistic shooting video on his cell phone during class hours.

78.     DOE's viewing of the violent, realistic shooting video during class hours constituted a violation of OCSD policies.

79.     Shortly before 9:00 a.m., DOE's math teacher reported to EJAK that DOE drew extremely disturbing pictures and words on his math assignment. The math assignment depicted a picture that DOE had drawn of his Sig Sauer 9 mm semi-automatic handgun with the words, "*The thoughts won't stop. Help me*[]" written underneath. To the right of those words was a drawing of a person with gunshot wounds to the torso and blood coming from the victim's mouth. A bullet was drawn under the words, "*Blood everywhere*." The bottom half of the math assignment depicted a drawing of a crying face emoji with the words, "*My life is useless*" and "*The world is dead.*"

80.     DOE's math teacher took a photo of the math assignment before DOE was able to change it, later than morning, by scratching out the drawings and words, replacing them with "*video game this is*", "*harmless act*", "*I love my life so much!!!!*", "*OHS rocks!*", and "*we're all friends here.*"

81.     The drawings and statements on DOE's math assignment were clearly violent and disturbing in nature and were an obvious cry for help. Moreover, they

were an overt and open depiction of DOE's desire to commit violent acts against himself and/or others.

82.  At approximately 9:00 am on November 30, 2021, EJAK advised HOPKINS of the drawings and accompanying words he had seen on DOE's math assignment.

83.  Thereafter, HOPKINS went to DOE's class and took him to the counseling office, where EJAK was waiting.

84.  At this point, DOE's backpack remained in the classroom.

85.  Defendant Hopkins would later testify that he was "concern[ed] about the student [DOE] because it was a couple of messages in a couple days, and the purpose of the meeting was to find out what our next steps would be."

86.  At some point, either before or during the meeting, EJAK returned to DOE's classroom to retrieve DOE's backpack, which contained DOE's Sig Sauer 9 mm semi-automatic handgun, forty-eight (48) rounds of ammunition and his journal.

87.  EJAK took DOE's backpack to the counseling office where DOE and HOPKINS waited. EJAK kept the backpack within his possession and control.

88.  At no point did EJAK or HOPKINS search DOE's backpack or locker to determine whether he was armed and dangerous.

89.     At no point did EJAK or HOPKINS search DOE's backpack or locker to determine whether he had immediate access to a deadly weapon that he could use to harm himself or others.

90.     During the meeting, HOPKINS questioned DOE about the violent, realistic shooting video that DOE was caught viewing during class that morning. In response, DOE claimed that the video he was watching was of a video game and not an actual event. Neither EJAK nor HOPKINS attempted to watch the movie to confirm DOE representation that it was of a video game.

91.     At that point, EJAK and HOPKINS had actual knowledge of an imminent safety threat and a concern for DOE's safety and welfare due to the events in the preceding months and days, which included DOE's ammunition search during class, DOE's statements to HOPKINS and FINE about his shooting hobby, viewing a violent, realistic shooting video during class and drawing disturbing pictures and words on his math assignment.

92.     During the meeting, HOPKINS also questioned DOE about the disturbing drawings and words on his math assignment. In response, DOE simply stated that it was for a video game he wanted to design.

93.     In response, HOPKINS stated, "This does not sound like a video game," indicating that he did not believe DOE's explanation.

94.     DOE did not attempt to refute HOPKINS' statement. Instead, DOE suddenly changed his demeanor. HOPKINS would later testify that DOE suddenly "became sad" and began described many stressors that had occurred recently in his life, including the death of his beloved dog, the death of a grandparent, the effect that the pandemic and virtual learning had on him and the loss of a close friend who had to leave school.

95.     HOPKINS would later testify that, at this point, he determined that DOE was suicidal with homicidal ideations, as evidenced by the disturbing drawings and words on his math assignment, and asked DOE if he was a threat to himself or others.

96.     In response, DOE stated: "*I can see why this looks bad. I'm not going to do anything*."

97.     HOPKINS would later testify that he did not accept DOE's answer and instead concluded that DOE was "a threat to himself in spite of his statement."

98.     Despite HOPKINS' self-serving statement, both he and EJAK had actual knowledge that DOE was homicidal and that he posed a significant, substantial and imminent threat to foreseeable victims; namely, students and others within the confined school building.

99.     During the previous year, three other OHS students assigned to HOPKINS had made suicide attempts.

100.   HOPKINS then called DOE's mother and left a voicemail. HOPKINS then immediately called DOE's father but was unable to speak to him or leave him a voicemail. HOPKINS would later testify that it sounded like "empty air" when he called DOE's father.

101.   DOE's mother then returned HOPKINS' call. Upon answering, HOPKINS placed the call on speakerphone so that DOE and EJAK could listen as HOPKINS spoke with her.

102.   During the call, HOPKINS expressed his immediate concerns regarding DOE's drawings and writings on his math assignments as well as the behavior DOE had exhibited. HOPKINS then asked DOE's mother to immediately come to OHS for an in-person meeting.

103.   In response, DOE's mother stated that she was at work and would try to get ahold of DOE's father.

104.   DOE's mother then called back and stated that she was coming to OHS and would arrive in a half hour.

105.   While awaiting DOE's mother's arrival, HOPKINS remained in the counseling office with DOE due to his belief that DOE was suicidal. As such, HOPKINS did not want to leave DOE alone.

106. At approximately 10:30 a.m., DOE's parents arrived at OHS and walked into the counseling office. HOPKINS then texted EJAK and asked him to return to the counseling office for the meeting.

107. EJAK and HOPKINS were immediately struck by DOE's parents' abnormal lack of warmth toward DOE and their unusual display of outward coldness toward him. HOPKINS would later testify that the behavior exhibited by DOE's parents was unlike any other meeting he had ever had with parents.

108. During the meeting with DOE and his parents, HOPKINS expressed his concerns for DOE's well-being and his conclusion that DOE was suicidal.

109. However, neither HOPKINS nor EJAK questioned DOE's parents about DOE's access to guns, despite having actual knowledge that DOE had (1) searched for and viewed ammunition on his cell phone during class, (2) discussed his shooting hobby with one or more of the Oxford Defendants, (3) been caught viewing a violent, realistic shooting video during class, (4) depicted a gun, bullets and a wounded person on his math assignment and (5) presented as suicidal with homicidal ideation.

110. Indeed, HOPKINS explained to DOE's parents that he thought DOE was suicidal and that he needed counseling, "today, if possible," indicating that he was aware of DOE's immediate threat to himself and others.

111.   Despite HOPKINS' grave concerns of imminent danger, DOE's parents refused to take him to counseling that day because they both had to return to work.

112.   HOPKINS would later testify that he was taken aback by DOE's parents' response because he had never previously experienced a situation where a student's parents were called to the school for such a meeting only to refuse the counselor's advice to take the student home, as requested.

113.   In response to DOE's parents' refusal, HOPKINS, in the presence of DOE, stated that if DOE didn't receive mental health counseling within forty-eight (48) hours, he would report the parents to Child Protective Services ("CPS"). The clear implication of this statement, or threat, was that DOE would be removed from the house and the parents would lose custody over their child.

114.   Furthermore, in making such a demand, HOPKINS and EJAK evidenced their awareness that, at a minimum, DOE was a threat to himself and others and that any failure to immediately address his mental health condition would constitute child abuse or neglect.

115.   Based on DOE's drawings and written statements, as well as the direct knowledge of FINE's involvement with DOE the previous day, HOPKINS and EJAK had reasonable cause to suspect child abuse or neglect and were thus required to report same to CPS and law enforcement, specifically the school liaison officer.

116.  In fact, HOPKINS and EJAK both knew that DOE needed immediate psychiatric intervention and evaluation based on his suicidal presentation and either knew or should have known that DOE had expressed homicidal ideation and that he was a substantial risk of deadly harm to others.

117.  DOE's parents, however, were undeterred by HOPKINS' statements and adamantly refused to take DOE home that day. Instead, DOE's mother insouciantly asked, "*Are we done?*"

118.  HOPKINS then turned to EJAK and asked whether there was any disciplinary issue that would prevent DOE from returning to class. When EJAK responded, "*No*," HOPKINS told the DOE's parents, "*I guess we are done*."

119.  At that point, DOE's parents left the school. The meeting among HOPKINS, EJAK, DOE and his parents lasted less than fifteen (15) minutes.

120.  HOPKINS would later testify that he *could* have stated that DOE was required to leave, and that DOE was exhibiting signs of needing help and support from his parents but instead received the opposite.

121.  The threat about contacting CPS had the clear and obvious effect of accelerating DOE's already rapidly deteriorating mental health.

122.  During the entirety of the meeting, DOE's backpack sat in the office unsearched, despite EJAK having handled it and knowing of its weight and uneven distribution.

123.   EJAK and HOPKINS deliberately chose not to search DOE's backpack (or locker) despite having just cause to either inspect its contents under M.C.L. § 380.1306.

124.   EJAK and HOPKINS, being well-trained in spotting issues of mental health and their relation to mass school violence, recognized that DOE's parents were either mentally incapable of helping their son or simply unwilling to do so.

125.   Nevertheless, after DOE's parents left, HOPKINS, in the presence of EJAK, returned the backpack containing the Sig Sauer 9 mm semi-automatic handgun and bullets to DOE's possession without inspecting its contents or turning it over to the liaison officer or other law enforcement officials. EJAK and HOPKINS thereafter chose to return DOE to his classroom with the backpack. In doing so, EJAK and HOPKINS took DOE from a place of safety and placed him in the school population with unfettered access to the deadly instrumentality he would use to murder or injure at least eleven persons at OHS that day, including A.W.

126.   Upon information and belief, once restored to him by HOPKINS, DOE maintained control of his backpack, permitting him to access it and carry out his assaults upon the shooting victims.

127.   Despite recognizing that DOE was suicidal and homicidal, EJAK and HOPKINS deliberately chose not to involve the school's liaison officer, an Oakland

County Sheriff's deputy with specific training in dealing with students like DOE, or POTTS, a former Oakland County Sheriff's deputy.

128.   The failure to keep the backpack and its contents from DOE's possession was an essential factor in allowing DOE to carry out his murderous assaults.

129.   At all times relevant hereto, the Oxford Defendants stood *in loco parentis* as to DOE and owed DOE a duty to protect him from his own suicidal ideation and the foreseeable and imminent risk that he would become a murderer, as he did.

130.   HOPKINS and EJAK knew that threatening to call Child Protective Services within forty-eight (48) hours, and threatening to remove DOE from his home, without actually taking any action, would create or increase the likelihood that, if DOE had violence in mind, he would act before he lost the opportunity.

131.   In making this demand upon DOE's parents, HOPKINS and EJAK evidenced their awareness that, at a minimum, DOE was a threat to himself and others, and that failure to address DOE's situation urgently was criminal neglect, which, in turn, triggered removal under the Michigan Child Protection Law.

132.   HOPKINS and EJAK deliberately conducted the meeting to the exclusion of the school safety liaison officer, thereby preventing him from being

present at the meeting and from having the ability to take action to prevent the mayhem that followed.

133. The first thing the sheriff's deputy would have done upon being notified of the circumstances would be to check DOE's backpack and locker. The Sig Sauer 9 mm semi-automatic handgun and bullets would have been discovered and DOE would have been expelled from school. The tragedy would have been avoided.

134. The deliberate decisions of EJAK and HOPKINS shocks the conscience and demonstrates conduct so reckless as to demonstrate a substantial lack of concern as to whether an injury would result to the students and others at OHS, including A.W.

135. Furthermore, the affirmative acts of the Oxford Defendants, as alleged in the foregoing allegations of this Complaint, greatly increased the danger posed by DOE and rendered the environment for OHS students, including A.W., less safe after their acts than before.

136. Within two hours of being released from the counseling office by EJAK and HOPKINS and allowed to return to his classroom, DOE took his backpack to a school bathroom, loaded ammunition into the Sig Saur 9 mm semi-automatic handgun and walked out of the bathroom to carry out the mass shooting, which included the shooting of A.W. and at least ten other students and/or teachers at OHS.

137.    At approximately 12:52 pm, the authorities were notified of an active shooter at OHS.

138.    Upon information and belief, DOE's massacre was halted when he was apprehended by law enforcement.

139.    On December 1, 2021, DOE was arraigned and charged as an adult with one count of terrorism causing death, four counts of first-degree murder, seven counts of assault with intent to murder, and twelve counts of possession of a firearm in the commission of a felony.

140.    By reason of the knowledge that the Oxford Defendants possessed before the shootings began on November 30, 2021, it was foreseeable by said Defendants that DOE would carry out acts of violence on OHS students, including A.W.

141.    The Oxford Defendants' affirmative actions were reckless and placed A.W. and others at substantial risk of serious and immediate harm.

142.    The Oxford Defendants knew or should have known that their actions would endanger OHS students, including A.W.

## C. Defendant Kimberly Potts' affirmative acts and omissions increased the danger of the school shooting at OHS on November 30, 2021.

143.    POTTS was, during the fall semester of the 2021-2022 school year, an OCSD employee working as a security officer/armed guard. Hence, OCSD is vicariously liable for POTTS' negligence and gross negligence.

144. Prior to her employment with OCSD, POTTS was an Oakland County Sheriff's Deputy who had received training in the use of firearms and deadly force.

145. POTTS was authorized to carry a firearm and was armed on November 30, 2021. In addition, she was provided an on-body camera and a radio.

146. POTTS knew or should have known that there was an active shooter (DOE) inside the school as of approximately 12:51 p.m., when DOE fired his first shot.

147. At that time, POTTS, should have immediately turned on her body camera, called for backup and medical assistance, and taken affirmative action to expeditiously locate and confront DOE to prevent harm to students, including A.W.

148. Instead of doing the above, for the next approximately four to five minutes, while the OHS student body were frantically running and hiding from DOE, POTTS, as per her statements to the investigators, assumed that it was an "ALICE drill" as opposed to an actual shooting and casually walked the halls with no apparent sense of urgency.

149. POTTS saw an OHS student lying on the hallway floor bleeding to death and told the investigators that she believed it was still a drill and that the student used "really good makeup."

150. POTTS informed the investigators that she eventually figured out, as she was walking the hallways, that this was not an "ALICE drill," pulled out her

firearm and, for some "unknown reason," went directly to the bathroom where two students and DOE were present.

151.   Allegedly, for some "unknown reason," POTTS opened the bathroom door with her gun drawn, but later told the investigators that she did not look inside or hear anything in the bathroom.

152.   As of that time, DOE had not shot either of the two students who were present in the bathroom with him at the time POTTS opened the door with her gun drawn.

153.   Upon information and belief, text messages sent by one of the two students in the bathroom with DOE at that time confirmed that the two students were alive at the time POTTS opened the door with her gun drawn.

154.   POTTS then closed the bathroom door and walked away.

155.   Shortly thereafter, DOE fatally shot one of the two students in the bathroom with him and threatened to shoot the other student next.

156.   Moments later, the surviving student ran out of the bathroom and down the hallway.

157.   At this time, POTTS finally turned on her body camera and began recording the aftermath.

158.   DOE exited the bathroom and saw Oakland County Sheriff's Deputies with long guns approaching him. He got down on his knees, put his firearm on top of the garbage can, had his hands in the air and surrendered.

159.   Notwithstanding her training, POTTS failed to clear the bathroom as she had been taught and failed to take appropriate action to prevent the murder of the student who was fatally shot in the bathroom.

160.   Upon information and belief, POTTS had the opportunity to prevent the shooting of A.W. and others had she taken appropriate action after shots rang out at OHS at approximately 12:51 pm on November 30, 2021.

**D. OCSD and its Administrators have engaged in a concerted effort to deflect responsibility for the OHS school shooting.**

161.   OCSD and its administrators adopted, implemented and followed an unconstitutional policy that resulted in the release of DOE from the safety and security of the counseling office, where he was safely supervised and where his movement and actions were restricted, and returned him to class, despite knowing the he was in the throes of a mental health crisis, obsessed with guns and gun violence, had access to firearms and was determined to be a threat to himself and others.

162.   Specifically, OCSD has sought to avoid accountability by claiming it has a formal policy and practice of returning students to class unless there is a "disciplinary" issue that can be used to either send them home or hold them in the

counseling office, and since DOE did not present a "disciplinary" issue, it had no choice but to return him to class.

163. OCSD's policy of using false justifications demonstrates egregious deliberate indifference to the danger presented when a student such as DOE, who the school knew was suicidal and presented a clear threat, is returned to the school environment.

164. The unconstitutional policy relied upon by The Oxford Defendants directly resulted in the harm to A.W. and is the basis for direct liability against OCSD.

165. On December 2, 2021, THRONE issued a video message which suggested that DOE had contact with the "front office" before the attack but could not be detained because discipline wasn't warranted. THRONE said, "I want you to know there's been a lot of talk about the student who was apprehended. That he was called up to office and all that kind of stuff. No discipline was warranted. There are no discipline records [for DOE] at the High School. Yes, this student did have contact with our front office. And yes, his parents were on campus on November 30."

166. This statement was deliberately misleading because of what it doesn't say. THRONE knew that on the morning of the shooting, DOE was deemed to be suicidal and then released from the safety and security of the counseling office,

where he was safely supervised and where his movement and actions were restricted.

THRONE knew that OCSD staff sent DOE back to class, despite knowing that he

was in throes of a mental health crisis, obsessed with guns and gun violence, had

access to firearms and was determined by OCSD staff to be a threat to himself and

others.

167.    During the week of December 6, 2021, THRONE wrote a letter to OHS

parents describing the events of the morning of November 30, 2021, when DOE was

in the HOPKIN's office. THRONE stated that at "no time did the counselors believe

the student might harm others based on his behavior, responses and demeanor, which

appeared calm." THRONE, at the time he made this statement, knew it was false.

Yet THRONE went on to say in the letter that "[w]hile both of his parents were

present, counselors asked specific probing questions regarding the potential for self-

harm or harm to others. His answers, which were affirmed by his parents during the

interview, led counselors to again conclude he did not intend on committing either

self-harm or harm to others. The student's parents never advised the school district

that he had direct access to a firearm or that they had recently purchased a firearm

for him."

168.    The above assertion by THRONE was false because HOPKINS did in

fact determine that DOE was suicidal and HOPKINS was fully aware that DOE was

experiencing a mental health crisis, was obsessed with guns and gun violence, had

access to firearms, and had verbalized a desire to harm others. When THRONE made these assertions, he knew they were false.

169.    Near the beginning of the letter, THRONE states that he "asked for a third-party investigation be conducted so we leave no stone unturned, including any and all interaction the student had with staff and students." At the end of the letter, THRONE wrote, "Again, I have personally asked for a third-party review of all the events of the past week because our community and our families deserve a full, transparent accounting of what occurred."

170.    OCSD has not fulfilled this pledge to the students, parents and the Oxford Community, including JARROD WATSON and LINDA WATSON.

## COUNT I – 14th AMENDMENT "STATE CREATED DANGER"
### *AGAINST DEFENDANTS EJAK AND HOPKINS*

171.    Plaintiffs incorporate by reference each preceding paragraph as if fully stated herein.

172.    At all times, A.W. had a constitutional right, secured by the 14th Amendment, not to be deprived of her life and substantive due process by government actors, acting with deliberate indifference, who placed a mentally ill student with homicidal and suicidal ideations back into the school population after he was safe and secure within the confines of the school counselor's office.

173.    A.W.'s constitutional right to bodily integrity and not to be deprived of life and due process was clearly established before November 30, 2021. *Kallstrom*

*v. City of Columbus,* 136 F.3d 1055, 1063 (6th Cir. 2006) ("[i]t goes without saying that an individual's 'interest in preserving her life is one of constitutional dimensions.' ") (quoting *Nishiyama v. Dickson County*, 814 F.2d 277, 280 (6th Cir. 1987 (en banc)); *McQueen v. Beecher Comm. Schools,* 433 F.3d 460 (6th Cir. 2006) (where a student shot and killed another student after being left alone by a teacher, the court stated, "[t]herefore, the first §1983 element – deprivation of a right secured by the Constitution or laws of the United States – is clearly satisfied.").

174.   EJAK and HOPKINS' affirmative act of sending DOE back to class while knowing he exhibited suicidal and homicidal ideations and had access to guns, and of returning DOE's unsearched backpack to DOE, as described above, created or increased the risk that A.W. would be exposed to an act of violence by DOE

175.   EJAK and HOPKINS' affirmative act created a special danger that A.W. and other students within the closed school building would be placed specifically at risk, as opposed to the public at large.

176.   Since the risk of violence was so obvious under the above-described circumstances, EJAK and HOPKINS knew or should have known that their actions specifically endangered A.W. and the other students within the closed school building.

177.   In returning DOE to the school population with his unsearched backpack after the parents' meeting, EJAK and HOPKINS acted with deliberate

indifference to the constitutional rights of A.W. and other students in the school. Defendants had plenty of time for reflection and unhurried judgment before choosing their fateful course of action.

178. It is shocking to the conscience that EJAK and HOPKINS would release DOE from the security of the counseling office and return him to the classroom where they knew that DOE was suicidal, knew that DOE had an obsession with guns and gun violence, knew that DOE had been researching bullets at school and informed HOPKINS that he enjoyed shooting guns, knew that DOE had been watching a violent, realistic shooting video during class, knew of the violent and disturbing images that DOE drew on his math assignment, knew that DOE's parents were informed of his suicidal ideation and abandoned him at school, knew that DOE was a threat to himself and others, and knew that they had an obligation to keep DOE away from the classroom environment even if the circumstances did not present a "disciplinary issue."

179. EJAK and HOPKINS' actions, as described above and throughout this Complaint, would shock the conscience of any reasonable person looking at the circumstances of November 30, 2021, as it was perfectly clear that DOE was crying out for help and his parents were mentally unfit or unwilling to help. Thus, EJAK and HOPKINS were the only two adults left in the room who could have prevented this predictable tragedy. They failed.

180.   The above-described conduct of EJAK and HOPKINS was the proximate cause of A.W.'s injuries and damages, including but not limited to:

    a.   Conscious pain and suffering;

    b.   Permanent scarring;

    c.   Fright, shock and terror;

    d.   Depression and anxiety;

    e.   PTSD;

    f.   Emotional distress;

    g.   Mental anguish;

    h.   Loss of future earning capacity;

    i.   Significant humiliation and embarrassment;

    j.   Medical bills associated with his extensive hospitalization and follow-up care;

    k.   Out-of-pocket expenses; and

    l.   Other economic and non-economic damages which are ongoing and will be permanent.

181.   The above-described conduct of EJAK and HOPKINS was the proximate cause of JARROD WATSON and LINDA WATSON's injuries and damages, including but not limited to:

    a.   Fright, shock, and terror;

    b.   Emotional distress;

c. Mental anguish;

d. The reasonable expense of necessary medical care, treatment and services received by their child;

e. The reasonable value of the society, companionship, and relationship with their child of which they have been deprived; and

f. All other damages that may be learned through the course of discovery.

WHEREFORE, Plaintiffs claim judgment against EJAK and HOPKINS in an amount to which they are found to be entitled, together with interest, costs, attorney fees and exemplary damages in addition to any further legal and/or other relief that this Court or a jury deems equitable or just.

## COUNT II – MONELL LIABILITY UNDER 42 U.S.C. § 1983
### *AGAINST DEFENDANT OCSD*

182. Plaintiffs incorporate by reference each and every previous allegation.

183. On and before November 30, 2021, OCSD had policies and customs in place that included, at a minimum:

a. An official policy of preventing trained staff and school administrators from suspending students or removing them from school unless there existed a "disciplinary justification" for such actions;

b. An unofficial custom or practice of preventing trained staff and school administrators from suspending students or removing them from school unless there existed a "disciplinary justification" for such actions;

    c. An unofficial custom or practice of minimizing or misrepresenting the severity of threats of violence by students or failing to adequately investigate same;

    d. An unofficial custom or practice of not notifying law enforcement officials, including the school's liaison officer, of the foreseeable risk of violence to students from another student;

    e. An unofficial custom or practice of minimizing or misrepresenting the severity of threats of violence by students in mental health crises if they did not comport with the OCSD's definition of a "disciplinary justification" for such actions;

    f. An unofficial custom or practice of discouraging staff from reporting suspected child abuse or neglect, in dereliction of their duties as mandatory reporters under MCL 722.623; and

    g. An unofficial custom or practice of discouraging staff from searching student lockers and their contents, including backpacks, despite students having no expectation of privacy under MCL 380.1306.

184. The OCSD policies, customs, and practices, were the moving force behind the constitutional violations committed against A.W. and others by the above-named individual Defendants.

185. The above-described conduct of OCSD was the proximate cause of A.W.'s injuries and damages, including but not limited to:

    a. Conscious pain and suffering;

    b. Permanent scarring;

    c. Fright, shock and terror;

    d. Depression and anxiety;

    e. PTSD;

f.  Emotional distress;

g.  Mental anguish;

h.  Loss of future earning capacity;

i.  Significant humiliation and embarrassment;

j.  Medical bills associated with his extensive hospitalization and follow-up care;

k.  Out-of-pocket expenses; and

l.  Other economic and non-economic damages which are ongoing and will be permanent.

186.  The above-described conduct of OCSD was the proximate cause of JARROD WATSON and LINDA WATSON's injuries and damages, including but not limited to:

a.  Fright, shock, and terror;

b.  Emotional distress;

c.  Mental anguish;

d.  The reasonable expense of necessary medical care, treatment and services received by their child;

e.  The reasonable value of the society, companionship, and relationship with their child of which they have been deprived; and

f.  All other damages that may be learned through the course of discovery.

WHEREFORE, Plaintiffs claim judgment against OCSD in an amount to which they are found to be entitled, together with interest, costs, attorney fees and exemplary damages in addition to any further legal and/or other relief that this Court or a jury deems equitable or just.

## COUNT III – SUPERVISORY LIABILITY UNDER 42 U.S.C. 1983, 1988 *AGAINST DEFENDANTS THRONE AND WOLF*

187. Plaintiffs incorporate by reference each and every previous allegation.

188. At all times relevant hereto, THRONE was the Superintendent of OCSD and directly supervised and oversaw the actions of WOLF, EJAK, HOPKINS and FINE and encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, and providing proper supervision for DOE and informing liaison officer or local law enforcement about DOE's violent plans.

189. At all times relevant hereto, THRONE was the Superintendent of OCSD and directly supervised and oversaw the actions of WOLF, EJAK, HOPKINS and FINE and encouraged the specific incident of misconduct or directly participated in it by discouraging the reporting, sharing, or mentioning of threats against OHS.

190. At all times relevant hereto, WOLF was the Principal at OHS and directly supervised and oversaw the actions of EJAK, HOPKINS and FINE and encouraged the specific incident of misconduct or directly participated in it by not expelling, disciplining, and providing proper supervision for DOE and informing liaison officer or local law enforcement about DOE's violent plans.

191.  At all times relevant hereto, WOLF was the Principal at OHS and directly supervised and oversaw the actions of EJAK, HOPKINS and FINE and encouraged the specific incident of misconduct or directly participated in it by discouraging the reporting, sharing, or mentioning of threats against OHS.

192.  By inadequately training and/or supervising their teachers, counselors, and Dean of Students, and having a custom or policy of indifference to the constitutional rights of their students, and/or by failing to adequately supervise DOE, THRONE and WOLF encouraged and cultivated the conduct which caused the violation of Plaintiffs' rights under the Fourteenth Amendment.

193.  By not expelling, disciplining, searching or providing proper supervision for DOE, THRONE and WOLF authorized, approved or knowingly acquiesced in the unconstitutional conduct of EJAK, HOPKINS and FINE.

194.  Pursuant to the Fourteenth Amendment, at all times relevant hereto, A.W. had a clearly established right to be free from dangers created by THRONE and WOLF.

195.  The above-described acts and omissions of THRONE and WOLF were performed under color of state law and were objectively unreasonable.

196.  The above-described conduct of THRONE and WOLF was the proximate cause of A.W.'s injuries and damages, including but not limited to:

      a.  Conscious pain and suffering;

    b.  Permanent scarring;

    c.  Fright, shock and terror;

    d.  Depression and anxiety;

    e.  PTSD;

    f.  Emotional distress;

    g.  Mental anguish;

    h.  Loss of future earning capacity;

    i.  Significant humiliation and embarrassment;

    j.  Medical bills associated with his extensive hospitalization and follow-up care;

    k.  Out-of-pocket expenses; and

    l.  Other economic and non-economic damages which are ongoing and will be permanent.

197. The above-described conduct of THRONE and WOLF was the proximate cause of JARROD WATSON and LINDA WATSON's injuries and damages, including but not limited to:

    a.  Fright, shock, and terror;

    b.  Emotional distress;

    c.  Mental anguish;

    d.  The reasonable expense of necessary medical care, treatment and services received by their child;

  e. The reasonable value of the society, companionship, and relationship with their child of which they have been deprived; and

  f. All other damages that may be learned through the course of discovery.

  WHEREFORE, Plaintiffs claim judgment against THRONE and WOLF in an amount to which they are found to be entitled, together with interest, costs, attorney fees and exemplary damages in addition to any further legal and/or other relief that this Court or a jury deems equitable or just.

## COUNT IV – PROSPECTIVE EQUITABLE AND INJUNCTIVE RELIEF (14TH AMENDMENT DUE PROCESS CLAUSE AND 42 U.S.C. 1983) *AGAINST DEFENDANT KENNETH WEAVER*

  198. Plaintiffs incorporate by reference each and every previous allegation.

  199. A.W. is currently a student at OHS.

  200. The Fourteenth Amendment to the United States Constitution forbids state actors from depriving any person of life, liberty, or property without due process of law.

  201. Based on the provisions of Michigan law regarding public education, the students of OCSD, including A.W., have a Constitutionally protected right to a public education, which is protected as a property interest under the Due Process Clause of the Fourteenth Amendment.

  202. Defendants OCSD and WEAVER must exercise their authority in the operations of the OCSD consistent with constitutional safeguards.

203.    As alleged in this Complaint, Defendants took affirmative state actions that, in accordance with official OCSD policy, created the danger of deadly violence at OHS, and which in fact caused the shooting at OHS on November 30, 2021.

204.    OHS remained closed, and its surviving students including A.W. were completely deprived of their right to a public education, from November 30, 2021 until January 24, 2022.

205.    Since OHS reopened on January 24, 2022, OCSD, as well as then-superintendent THRONE and current superintendent WEAVER, have failed to remedy the unconstitutional policies and customs that caused the shooting to occur, and have therefore deprived the surviving students, including A.W., of the full and equal enjoyment of their property right to a public education.

206.    Yet, to date, OCSD has not undertaken any measures to restore the property right of OHS students, including A.W., to the full enjoyment of a public education at OHS.

207.    OCSD's failure to restore the full property interest of students to a public education include, and are not limited to:

  a. After the shooting, through then-superintendent THRONE, OCSD promised it would complete a thorough and independent investigation to review its actions and the events leading to the shooting. To date, OCSD has completed the investigation it promised.

  b. OCSD maintains its unconstitutional policy of prohibiting administrators from holding students out of the classroom, even

where they are suicidal and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, OCSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when DOE was released from the counseling office to the classroom on November 30, 2021.

c. OCSD maintains a policy of failing to train administrators that they can restrict suicidal students from returning to the classroom.

d. OCSD maintains a policy of failing to train administrators in how to complete a thorough and effective risk assessment for suicidal students.

e. Since the shooting, OCSD has engaged in a concerted cover story of its actions leading to the shooting. This includes, and is not limited to, asserting in court proceedings and in the media that it properly returned DOE to the classroom on November 30, 2021, despite knowing he was suicidal, because his case did not present a "disciplinary issue" that would warrant keeping him in the counseling office that day.

208. To redress and remedy these unconstitutional practices, A.W. requests the following prospective equitable and injunctive relief:

a. An order requiring OCSD and/or Superintendent WEAVER to immediately begin an independent investigation of the actions and events leading to the school shooting on November 30, 2021;

b. An order requiring OCSD and/or Superintendent WEAVER to immediately cease its policy, practice, or custom of concealment, misrepresentation, minimizing or avoidance and non-escalation to higher authorities, including law enforcement, of suspected or known risks of school violence;

c. An order requiring OCSD and/or Superintendent WEAVER to immediately reform its policy of prohibiting administrators from holding students out of the classroom, even where they are suicidal

and where there is probable cause to know that they pose a risk of harm to themselves and others, so long as the circumstances do not present a "disciplinary" issue. So long as this policy is maintained, OCSD will continue to place suicidal students in the classroom even where they pose a threat to themselves and others, as happened when DOE was released from the counseling office to the classroom on November 30, 2021;

d. An order requiring OCSD and/or Superintendent WEAVER to secure proper training for administrators to understand that they can hold and/or restrict students in the counseling office, and not return them to class, if they are suicidal or if there is probable cause to believe that they are a threat of harm to themselves or others;

e. An order requiring OCSD and/or Superintendent WEAVER to secure proper training for administrators in how to conduct a proper risk assessment when students are suicidal;

f. An order requiring OCSD and/or Superintendent WEAVER to secure proper training for administrators to ask students and family members whether a student owns or has access to deadly weapons, including firearms, when appropriate to assess the level of safety risk;

g. An order requiring OCSD and/or Superintendent WEAVER to secure proper training for administrators and other staff of when and how to conduct a legal search of student belongings, including backpacks and lockers;

h. An order requiring OCSD and/or Superintendent WEAVER to publicly retract all statements made in the course of its cover story after the shooting, including a retraction of all statements suggesting that HOPKNS and EJAK acted properly in releasing DOE from the counseling office and returning him to the classroom, even though he was suicidal, based on the assertion that there was no "disciplinary issue" that could be used to restrict him to the counseling office or other safe location, without returning him to class; and

      i.  All other prospective equitable and injunctive relief the Court deems necessary to restore Plaintiff's property right to a full public education, as protected by the Due Process Clause of the Fourteenth Amendment.

## COUNT V – GROSS NEGLIGENCE
### *AGAINST THE OXFORD DEFENDANTS*

209.   Plaintiffs incorporate by reference each and every previous allegation.

210.   On November 30, 2021, A.W. was a 15-year-old sophomore at OHS.

211.   At that time, A.W. was physically present at OHS and was aware that his life was in danger or that he needed to take precautions, such as refraining from attending school that day.

212.   As a direct result of the actions of the Oxford Defendants, as set forth in the foregoing sections of this Complaint, A.W. was shot through the leg by DOE, causing serious and permanent injuries and damages.

213.   The Oxford Defendants had the duty to exercise reasonable care with regard to potential threats to the safety of OHS students made known to them in the course of their employment and to take reasonable measures to prevent an unreasonable risk of harm to students and others on the premises of OHS.

214.   The Oxford Defendants had a duty to protect OHS students, including A.W., from the conduct of DOE of which the Oxford Defendants knew or should have known was likely to occur.

215. The Oxford Defendants stood *in loco parentis* as to A.W. and had a duty to protect him from the unreasonable risk of injury posed by DOE on November 30, 2021.

216. The Oxford Defendants breached those duties in the ways and for the reasons set forth in the foregoing allegations of this Complaint.

217. Further, the Oxford Defendants had a duty to refrain from taking actions that were so reckless as to demonstrate a substantial lack of concern for whether an injury results, thereby causing injury.

218. In deliberate breach of his duty, THRONE concealed, minimized and downplayed the known risk of harm to OHS students and affirmatively discouraged students, parents, teachers and administrators from reporting or taking action to alleviate the risk of deadly violence at OHS.

219. In deliberate breach of his duty, WOLF concealed, minimized and downplayed the known risk of harm to OHS students and affirmatively discouraged students, parents, teachers and administrators from reporting or taking action to alleviate the risk of deadly violence at OHS.

220. In deliberate breach of their duties, EJAK and HOPKINS released DOE from the safety and security of the counseling office after determining that DOE was experiencing suicidal and homicidal ideations, without taking any precautions, which would have reasonably included a search of DOE's backpack and/or locker

or informing DOE's teachers of his suicidal presentation, thus placing A.W. and other OHS students in the way of deadly harm that was both preventable and reasonably likely to occur.

221.   The Oxford Defendants were aware of multiple "red flags" that alerted or should have alerted them to the imminent threat of harm to OHS students by DOE However, in deliberate breach of their duties, the Oxford Defendants deliberately ignored OCSD policies and Michigan laws requiring immediate intervention based on DOE's conduct indicating acute psychiatric distress, violent ideation related to firearms and indicators of child abuse or neglect, of which the Oxford Defendants were aware, which would have allowed DOE to obtain the help he needed and would have prevented the massacre that occurred after DOE was released back to class with his unsearched backpack.

222.   Based on the reports to OCSD administration and staff as well as the conduct of DOE of which the Oxford Defendants were aware, as alleged in the foregoing allegations of this Complaint, it was reasonably foreseeable that returning DOE to class with his unsearched backpack would result in harm to DOE and/or other OHS students, including A.W.

223.   The Oxford Defendants breached their duty of care by deliberating choosing to return to DOE to class with his unsearched backpack despite the

following facts indicating a foreseeable and likely risk of deadly harm to OHS students of which the Oxford Defendants were aware:

    a. That DOE presented to HOPKINS and EJAK as suicidal with homicidal ideation;

    b. That DOE presented to HOPKINS, EJAK and other OCSD staff a threat to himself or others;

    c. That DOE had access to guns;

    d. That DOE shot guns as a hobby;

    e. That on November 11, 2021, LINDA WATSON and others had reported to OCSD threats of an imminent school shooting based on reports by several students, including A.W., indicating that DOE had posted threats to "shoot up the school" on his public social media accounts;

    f. That on November 29, 2021, DOE had been caught searching for ammunition during class, in violation of OCSD policies, and that DOE's teacher or teachers had expressed concerns regarding the same;

    g. That on November 30, 2021, at approximately 8:30 am, DOE had been caught watching a violent, realistic shooting video during class, in violation of OCSD policies, and that DOE's teacher or teachers had expressed concerns regarding the same; and

    h. That on November 30, 2021, at approximately 9:00 am, DOE had been caught drawing violent and threatening pictures and words depicting gun violence and despair on a math assignment during class, and that DOE's teacher or teachers had expressed immediate concerns regarding the same.

    224. The acts and omissions of the Oxford Defendants– including but not limited to their inadequate and dangerous policies and practices; their affirmative

decisions to exclude intervention by CPS and law enforcement despite obvious signs of child abuse or neglect; their repeated decisions to keep DOE in school and in class, even after determining he was experiencing suicidal and/or homicidal ideations; their affirmative decisions to dismiss as rumor credible reports by OHS parents and students regarding an imminent school shooting; and their ultimate deadly decision to return DOE's backpack to him after choosing not to conduct a search–were so reckless as to demonstrate a substantial lack of concern for whether an injury results, and therefore, the Oxford Defendants breached their duty of care.

225.   The acts and omissions of the Oxford Defendants were the proximate cause of injuries and damages to A.W. because such acts and omissions directly placed A.W. in harm's way; provided DOE with access to the weapons he ultimately used to complete the school shooting, resulting in A.W.'s gunshot wound to his leg; and caused DOE to escalate his behavior from violent ideation to violent conduct.

226.   At all times relevant hereto, POTTS had a duty to exercise reasonable care and not be grossly negligent in the performance of her duties especially given her training and experience as a law enforcement officer.

227.   The acts and omissions of POTTS, as set forth in the previous allegations and those set forth below, constitute breaches of these duties are evidence of gross negligence for which OCSD is vicariously liable:

      a.  Failing to timely and properly assess an active shooting situation.

b.  Improperly assuming that an ALICE drill was being performed.

c.  Failing to recognize an active shooting after witnessing an injured student who had been shot lying on the floor bleeding to death and immediately turning on her body camera, calling for backup, requesting medical help, and expeditiously locating and confronting DOE to prevent harm to other students.

d.  Failing to properly inspect the bathroom where two students and DOE were present.

e.  Failing to timely intervene and confront DOE

f.  Other acts or omissions to be discovered.

228.  POTTS breaches of said duties constituted gross negligence since they amounted to conduct so reckless as to demonstrate a substantial lack of concern as to whether injury would occur.

229.  As a direct and proximate result of the acts and omissions of the Oxford Defendants, A.W. was shot through his leg at close range by DOE, causing him the following injuries, which he has suffered and will continue to suffer:

a.  Conscious pain and suffering;

b.  Permanent scarring;

c.  Fright, shock and terror;

d.  Depression and anxiety;

e.  PTSD;

f.  Emotional distress;

g.  Mental anguish;

    h.  Loss of future earning capacity;

    i.  Significant humiliation and embarrassment;

    j.  Medical bills associated with his extensive hospitalization and follow-up care;

    k.  Out-of-pocket expenses; and

    l.  Other economic and non-economic damages which are ongoing and will be permanent.

230.   This has manifested in A.W.'s inability to sleep, recurrent nightmares, fear of attending school, inability to enjoy movies and games that reprise the shooting incident at OHS and fear of any loud, sudden noises such as fireworks. These damages are expected to continue into the undetermined future.

231.   As a direct and proximate result of the damages to their son, Plaintiffs JARROD WATSON and LINDA WATSON, have suffered and will continue to suffer losses into the future, due to the injuries and damages suffered by their son, A.W., including, but not limited to:

    a.  Fright, shock, and terror;

    b.  Emotional distress;

    c.  Mental anguish;

    d.  The reasonable expense of necessary medical care, treatment and services received by their child;

    e.  The reasonable value of the society, companionship, and relationship with their child of which they have been deprived; and

     f. All other damages that may be learned through the course of discovery.

WHEREFORE, Plaintiffs claim judgment against the Oxford Defendants in an amount to which they are found to be entitled, together with interest, costs, attorney fees and exemplary damages in addition to any further legal and/or other relief that this Court or a jury deems equitable or just.


Respectfully submitted,

FLOOD LAW, PLLC
Attorneys for Plaintiffs

/s/ Todd F. Flood
TODD F. FLOOD (P58555)
VINCENT J. HAISHA (P76506)
155 W. Congress St., Ste. 603
Detroit, MI 48226
(248) 506-0132
tflood@floodlaw.com
vhaisha@floodlaw.com


Dated:  August 21, 2022

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JARROD WATSON, and LINDA WATSON,
as co-Next Friends for A.W., a minor; and
JARROD WATSON and LINDA WATSON,                    Case No.
individually,                                      Hon.

              Plaintiffs,

v.

OXFORD COMMUNITY SCHOOL DISTRICT;
TIMOTHY THRONE, in his individual capacity;
STEVEN WOLF, in his individual capacity;
NICHOLAS EJAK, in his individual capacity;
PAM PARKER FINE, in her individual capacity;
SHAWN HOPKINS, in his individual capacity;
KIMBERLY POTTS, in her individual capacity; and
KENNETH WEAVER, in his official capacity,

              Defendants.

_____/

## **JURY DEMAND**

      Plaintiffs, through their attorneys, FLOOD LAW, PLLC, hereby demand a

trial by jury of all issues in above-captioned matter.

              Respectfully submitted,

              FLOOD LAW, PLLC
              Attorneys for Plaintiffs

/s/ Todd F. Flood
TODD F. FLOOD (P58555)
VINCENT J. HAISHA (P76506)
155 W. Congress St., Ste. 603
Detroit, MI 48226
(248) 506-0132
tflood@floodlaw.com
vhaisha@floodlaw.com


Dated:  August 21, 2022